## Van Nest v. Yoe and others.

A voluntary assignment was executed by A. and B., conveying the whole of their estate and effects to C., in trust for the benefit of all their creditors, giving a preference to C. It appeared by the answer, that the assignors executed it because they were unable to pay their debts, as they would respectively fall due and become payable, and *with a view of having their effects and claims turned to the best account, and to have them, or the proceeds thereof, applied to the payment and satisfaction of their debts and liabilities, so far as the same were necessary for that purpose.* It also appeared, that at the time of its execution, the assignors supposed they were solvent, and would have a surplus after paying all their debts. *Held,* that the assignment was made with the intent to hinder, delay or defraud the creditors of A. and B.

The conclusion would have been the same, if it had appeared that the assignors were in truth insolvent at the time of its execution; it being clearly proved that they believed they had a surplus, and executed the assignment with a view to such surplus. The law regards the intent of the assignor, and the result of his acts will not cure the fraudulent design.

The want of an inventory of the effects assigned, and the omission of a schedule of the creditors of the assignors, deemed a badge of fraud in connection with other circumstances.

So of a provision in the assignment, that the assignee should not be accountable for any defalcation committed by any clerk employed by the assignors, or either of them, in the execution of the assignment.

The assignee was the father of B., and resided about 300 miles from the place where A. and B. transacted business. He never took the actual possession of the property assigned; leaving A.'s effects in his possession, and those of A. and B., in the possession of the latter, to sell and collect. *Held,* on this ground also, that the assignment was fraudulent.

The complainant's partner had received a payment on account of his debt, from the assignee; but he had been informed that the creditors were all to share alike under the assignment, and he was ignorant of the fraudulent circumstances connected with it. *Held,* that he was not, by such receipt, precluded from setting aside the assignment for fraud.

April 8; April 26, 1843.

THE complainant obtained a judgment at law, against the defendants R. A. Yoe and J. R. Bleecker, and issued an execution thereon, which was returned unsatisfied.

He thereupon commenced this suit against the judgment debtors and Charles Yoe, their assignee, to set aside their assignment as fraudulent and void against creditors, and to compel payment of his debt.

The debtors, Yoe and Bleecker, were hardware merchants in the village of Syracuse, in the county of Onondaga; R. A. Yoe residing there, and J. R. Bleecker residing in the city of New-York. On the 25th of April, 1837, they made an assignment of all their property to Charles Yoe, of Sing Sing, in Westchester county, the father of R. A. Yoe, for the benefit of their creditors, giving a preference to Charles Yoe over all the others. The facts bearing upon the points discussed are stated in the opinion of the court.

*John W. Hammersley,* for the complainant.

*Jona. Miller* and *J. Blunt,* for the defendant Charles Yoe.

THE ASSISTANT VICE-CHANCELLOR.—The complainant alleges that the assignment in question is fraudulent and void upon its face, as being intended to hinder, delay, or defraud creditors ; and refers to several provisions of the instrument in support of this position.

One of those provisions is thus expressed :—" Nothing however herein before contained shall be considered as restricting or preventing" the assignee "from liquidating or compounding with any of the creditors" of the assignors " by making over, assigning, or transferring, any of the choses in action, debts or accounts due to the" assignors. This is rather the reservation of a supposed existing right, than the grant of a power. We are not to imply a power from the instrument in order to overturn it, but we are to construe it if practicable, so as to give effect to every part of it. Having this rule in view, I cannot presume a fraudulent intent from this clause. The preceding provisions of the assignment are full and explicit that the proceeds of the trust fund, after satisfying the debts due to Charles Yoe, and for which he is liable, shall be applied rateably to the payment of all the other debts of the assignors, without any priority or preference.

Another provision deemed objectionable, is the power to mortgage. This is not contained in the declaration of the trusts of the assignment, but in the clause constituting the assignee

the attorney of the assignors to do various acts in their names in the premises, such as "to make all deeds or proper conveyances, assignments, mortgages, releases or discharges," &c. The case of *Darling* v. *Rogers and Sagory*, (22 Wend. 483,) decides that this power, if it had been made one of the express trusts of the assignment, would not render it void, and it is unnecessary to consider it farther.

The next provision which I will consider, is that relative to the defence of suits against the assignors. It is a part of the clause making the assignee their attorney, and empowers him, "in his or their name or otherwise, to commence, continue, "maintain, and prosecute to effect, and also *to defend all law*, "*equity, and other proceedings, which they may deem neces-* "*sary to the execution of the said trusts*." Although the word "*they*" is used, it is plain that "*he*" was intended, and giving the sentence its literal scope, it merely confers a discretionary power to defend suits, which the assignee, would execute at his peril, as between him and the creditors interested. I do not perceive in this provision any marked evidence of fraud, nor indeed much that the assignee could not have done if the whole clause had been omitted.

The next sentence in the assignment forms the ground of another objection. It provides that the assignee shall not be accountable for any defalcation, committed by any clerk, agent, or assistant, "necessarily employed *by them, or either of them*, in the execution and performance of the trusts hereby created." The language of the instrument here applies to clerks, &c., employed by the assignors. The defendant insists that this was a clerical mistake, as well as the word "*they*" in the clause just considered, and the word "*they*" in the conclusion of the instrument, by which the assignee is made to covenant that he and the assignors will faithfully execute the trusts. This explanation would be satisfactory in reference to the sentence in question, were it not that subsequent events show that the employment of clerks by one of the assignors was probably in the contemplation of the parties at time of making the assignment. This exemption from liability, if intended to be limited to defalcations by clerks employed by the assignee, is

not restricted to his employment of clerks in good faith. And I cannot but regard the whole provision as one calculated to impress the mind with serious doubt as to the honesty of the instrument in which it is found. (See *Pitt's Trustees* v. *Viley*, 4 Bibb, 446.)

Another objection is, that the assignment directs the payment of the separate debts of the assignors to Charles Yoe, out of the partnership property. It is not necessary for me to inquire whether this evinces a fraudulent intent, inasmuch as it turns out that Bleecker's separate property assigned exceeds the whole amount of the separate debts of both partners.

The next objection to the assignment is the absence of an inventory of the property and effects assigned. This is not of itself a strong badge of fraud, but frequently becomes one in connection with other circumstances. This case well illustrates the importance of an inventory. The assignee does not give a statement or pretend to know, what property was assigned to him, or its amount. It is evident that he never did know. The assignment was dated in April. He attaches to his answer a schedule showing an inventory of goods on hand dated in May ; and another schedule containing the debts due to Yoe and Bleecker in August, 1837, four months after the assignment. In the mean time, R. A. Yoe was in possession, selling the goods, and collecting the debts. The defendant says that these schedules contain all the assigned property which *came to his possession or knowledge.* This may be conceded, and still leave a wide margin for fraudulent dispositions by the assignors, of other property to a large amount. The assignment is also silent as to the names of the creditors, and the amount of their debts, with the exception of the preferred claims of Charles Yoe, and the answer does not supply the omission.

I will now examine the case, as it is presented to me by the evidence.

It appears that Yoe and Bleecker made this assignment, not because they were insolvent, and desired to benefit all their creditors by avoiding the sacrifices which the more vigilant of the number might otherwise occasion to the pre-

judice of the more tardy, and those whose debts were not yet due ; but because being solvent, they "were unable to " pay their debts as they would respectively fall due and " become payable, *and with a view of having their effects* " *and claims turned to the best account,* and to have them " or the proceeds thereof, applied to the payment and satisfac-" tion of the debts and liabilities of the said Yoe and Bleecker, " *so far as the same were necessary for that purpose."* In other words, they chose to have an extension of the time of payment, without the leave of their creditors, in order to save a larger surplus than would be possible if payment were enforced when their debts matured. I have quoted the language of the answer, and it reiterates that both Yoe and Bleecker, told the assignee at the time of executing the assignment, that they deemed themselves solvent, and able fully to pay all their creditors and have a surplus, and that the assignee believed it ; and upon that information and belief, he denies that Yoe and Bleecker, at the time of the assignment, knew or believed that they were insolvent. One of the assignors, who was examined as a witness for the assignee, testifies to the same facts. If this assignment was not made " with the intent to hinder, delay, or defraud creditors of their lawful suits, debts, or demands," (2 *Rev. Stat.* 137, § 1,) I cannot understand the force of language.

The debtor finding himself embarrassed and unable to meet his engagements, and liable to suits, judgments, and executions ; yet having more property than is sufficient to pay all his debts, shrinks from the sacrifice which the law inexorably exacts, and in order to save to himself a portion of his property, makes an assignment. In effect he says to his creditors, I have a surplus of property after paying all my debts, but I will not permit you to sell it on execution, because that will reduce or destroy the surplus. I will vest it in assignees *for your benefit.* They can sell it and pay you at their discretion. They can wait for brighter days, when property can be sold without a sacrifice. If you become impatient, you can compel them to proceed, after a reasonable time, by resorting to a suit in the court of chancery. It is easy for the debtor to clothe the act

with the usual declaration, that it is made for the *payment of all his creditors*, and for their benefit; and it is seldom that the parties are candid enough to accompany this declaration with the avowal, that it is designed to prevent the sacrifice of an abundant estate. But whether the avowal be made or not, no one acquainted with human nature can doubt that the protection of the interests of the debtor in the surplus, is in these cases, the all-powerful motive for the act. No assignment was ever made by a debtor who supposed himself to be solvent, with a view, or for the purpose of selling and converting his property into money more speedily than it could be done by process of law. If such were his design, he would effect it himself without the intervention of an assignee. The real object is to gain time; to prevent the speedy sale and conversion which an execution would inevitably accomplish.

The law provides that the debtor shall fulfil his obligations, and on his default it gives to the creditor his "lawful suit" for the recovery of his demand, and the sale of the property of the debtor for its payment. This is a strict right. And the debtor, who believing himself more than solvent, places his property beyond the reach of the process of the law, whatever may be the pretence under which he cloaks the act; in the language of the statute of frauds, "hinders" and "delays," and ultimately "defrauds" his creditors. It is no answer to this argument to say, that the debtor provides an ample fund for the payment of the debt, and that the creditor is *ultimately* to be paid in full. The law gives to *the creditor*, the right to determine whether his debtor shall have further indulgence, or whether he will pursue his remedy for the collection of the debt. The deferring of payment, is generally an injury to the creditor; and he may be overwhelmed with bankruptcy for the want of the fund which is locked up by the voluntary assignment of his debtor. It is a mockery to such a creditor to say that the assignment is made *for the benefit* of creditors.

I have treated the case as one where the debtor was solvent when he made the assignment. If he were in fact insolvent at the time, yet believed that he was solvent, and would have a surplus, the conclusion would be the same. The statute regards

the *intent*, with which the act was committed. It declares that the assignment shall be void, if it be made *with the intent* to hinder, delay, or defraud.

There are many cases, where sales have been held void under the statute, because of the fraudulent intent,—where a full consideration was paid by the purchaser. Such was Twyne's Case, 3 Rep. 80 b. And see *Worseley* v. *Demattos*, (1 Burr. 467. 474 ; 2 Bailey's Law Rep. 324, *Lowry* v. *Pinson*.)

We are to arrive at the intention of the parties by the state of things existing at the time of the assignment, and not by subsequent events which were then neither foreseen nor anticipated. It therefore does not rebut the evidence of the fraudulent intent in this case, to prove that as the assignment turned out, the assignors' property was, in fact, insufficient to pay their debts. Considering the mode in which the trust was executed, it would have been surprising if enough had been realized from it for that purpose. There is no evidence, which shows that Yoe and Bleecker were not, in truth, solvent when they assigned, nor but that they would have had the expected surplus, if they had closed their business with the care and attention which men usually bestow upon their own affairs.

I do not find that this point has ever been the subject of judicial examination in this state. Our courts have repeatedly held, that the insolvent debtor shall not, by his assignment, reserve to himself any, the least pecuniary provision for himself or his family, or any stipulation or reservation for his own peculiar advantage. The reservation to the assignor of an annuity, or other interest in the property, the power to direct preferences after the making of the assignment—and finally, the coercion of the creditor into the execution of a release of his debt, in order to participate in the distribution of the effects of his debtor, have successively been exploded, and the assignor restricted to an absolute and unconditional transfer of his effects for the benefit of his creditors. See *Hyslop* v. *Clarke*, (14 Johns. 458 ;) *Austin* v. *Bell*, (20 Id. 442 ;) *Mackie* v. *Cairns*, (5 Cow. 547 ;) *Wakeman* v. *Grover*, (4 Paige, 23 ; and 11 Wend. 187.)

The principle of these decisions extends to the advantage sought to be secured by the debtors in this instance; the reservation of a surplus after paying their debts, which they apprehended would be lost to them, if their creditors enforced the ordinary remedies provided by law.

In Kentucky, the question has been examined and decided.

In *Ward* v. *Trotter*, (3 Monroe's R. 1,) one Kelly had executed a deed of his property in trust for creditors, in which he recited, that he "being under embarrassed circumstances, and "without money to meet those claims, makes this transfer to "*prevent* a *sacrifice* of his property, which he deems ample "for the payment of his debts." The deed, also, stated, that it was "expressly made and designed to secure the payment of "his debts" with the property, and to avoid its sacrifice at the discretion of his creditors. The court held on these clauses, that the deed was intended to hinder creditors from effectively using the lawful means of obtaining the payment of their debts, and that it was fraudulent and void by the statute of frauds.

In *Vernon* v. *Morton et al.* (8 Dana's R. 247. 263,) the same doctrine is held by the court of appeals. They say that, "if the intention in executing the deed be to hinder "and delay creditors, it will vitiate the whole deed, though "it be made upon a good consideration, or for the just and "equitable purpose of securing an equal distribution of the ef- "fects among all the creditors." "When it appears on the face "of a deed of trust, that the motive for making it was to *pre-* "*vent a sacrifice* of the property, a bad motive is shown, a "motive to obstruct the ordinary process of law, in the subjec- "tion of the property to the payment of the debts which vitiates "the whole deed. So, if that motive and intention be proved "*aliunde*."

Fully believing that these decisions are sound, both in law and morals, I must adopt them in this case, and hold that the assignment is fraudulent and void as against the complainant.

The case presents another prominent point against the validity of the assignment. It is proved that there was not an immediate delivery of the goods assigned, and that the assignment was not followed by an actual or continued change of pos-

session of the property. The only delivery or change of the possession, which is set up by the defendant, is that produced by R. A. Yoe's becoming the agent of the assignee, and holding the goods and effects in that capacity. The assignee never had the possession for a moment, of a single item of the property assigned. The goods and things in action of Yoe and Bleecker, remained in the possession of R. A. Yoe after the assignment, precisely as they did before. He sold the one and collected the other, as if no transfer had been made. The store was kept open for more than fourteen months after the making of the assignment, at a rent of $350 per year, and with a large outlay for expenses. It seems that two clerks were employed, in addition to R. A. Yoe himself. And the account of the expenses of the establishment at Syracuse, for the fourteen months, foots up at $1284 25; besides an indefinite sum for the support and personal expenses of R. A. Yoe, who, during that period and long after, appears to have been maintained, in a great measure, out of the concern, without keeping any account of what he appropriated for that purpose. Such payments as were made to the creditors, were made by Bleecker. Some of the money was sent to him directly by R. A. Yoe, and some came to him through Charles Yoe, to whom R. A. Yoe had remitted it. Six or eight months after the assignment, Bleecker purchased a new bill of goods in New-York, in the name of the firm, and sent it to the firm at Syracuse to be sold, and the assignee charges for the transportation of those goods in his account for expenses paid out.

Bleecker was a house-keeper in New-York, having furniture, &c., in his possession. The assignee never took possession of it, and states in his answer, that he is ignorant of its amount and value. Bleecker, also, had a mortgage of $4300 against one Morrell, on real estate at Sing Sing.

The assignee has never had it in his possession, and although Morrell resided every summer and fall in the same village with the assignee, the latter never called on him for principal or interest, but suffered Bleecker to collect and use the interest, and $700 of the principal. The assignee says, in his

answer, that he informed Morrell of the assignment, but the statement is not responsive to the bill, and is not proved. The defendant's answer was verified in November, 1841, and at that time there remained unsold at Syracuse $850 of the goods assigned in April, 1837.

The circumstances, thus briefly adverted to, establish the presumption of fraud in the transaction, in a clear and convincing manner.

Has the defendant made it to appear, that the assignment was made in good faith, and without any intent to defraud creditors? Has he furnished any satisfactory explanation of those facts which the statute declares "shall be conclusive evidence of fraud," unless they are thus accounted for?

In reference to the furniture and mortgage assigned by Bleecker, no explanation is attempted. The excuse for leaving the partnership property in the possession of R. A. Yoe, is the usual one of convenience in its collection and sale. The defendant says, that some person would have to be employed as agent, and who so proper as the former owner? The necessity for an agency in this case is one of its extraordinary features. Instead of making an assignment to some competent and responsible person, in the large and flourishing town where the property and things in action were situated, the father of the acting partner, residing nearly three hundred miles from that place, is made the sole assignee; as if it had been the intention of the parties to prevent even a nominal change in the conduct of the business of the firm. It is alleged, also, that many of the creditors approved of the assignee's course, in continuing R. A. Yoe in possession, and disposing of the goods at private sale. I believe, two of the creditors testify that they approved of this proceeding. The complainant did not sanction it, and the approval of some of the creditors, who, perhaps, were propitiated by payment from time to time, cannot vindicate this mode of executing the trust. Without going into an examination of the much vexed question as to what evidence shall be sufficient to rebut the presumption of fraud, where there has been no change of possession of the property sold or assigned, or of the learning which, within a few years past, has been so

elaborately applied to the elucidation of this question; I shall content myself with declaring that the explanations attempted in this case, do not, in my judgment, rebut that presumption. And the supposed solvency of the assignors, when they executed the assignment; the omission of any accompanying, or subsequent inventories, of all the property included in the assignment; the singular clause exempting the assignee from loss by the defalcation of clerks employed by the assignors; the want of any change whatever in the possession of the assigned property, and the control and disposition of it by the assignors, as if no such transfer had been executed; leave me no room to doubt, but that this assignment is fraudulent and void as against creditors.

The defendant insists, that the complainant, having received dividends from the assignee, with knowledge of the contents of the assignment, or the means of acquiring such knowledge, and knowing the manner in which the assignee was disposing of the goods, is estopped from objecting to the assignment as fraudulent. I find no allegation of either of these facts in the answer, unless the statement that the defendant has paid out some $6500 of the proceeds of the assigned property to the creditors of Yoe and Bleecker, *including the complainant*, is an allegation of the payment of a dividend. I have great doubts whether the answer is sufficient to raise the question.

Assuming that the point is fairly presented, I will proceed to examine its validity.

There has been no such thing as a dividend under the assignment. In two instances payments were made to creditors, who obtained judgments soon after the assignment, and who threatened further proceedings; one about half, and the other nearly the whole of his demand.

The other payments to creditors were made, apparently, as the fancy or caprice of Bleecker dictated; to some creditors a large proportion, to others a little, and to others none. All the payments made upon the complainant's debt, were made by Bleecker, and neither of them was made *to the complainant*. Two of the payments on his debt were made to a clerk—one of $25, August 24th, 1837, and receipted as from Charles Yoe,

on account of Yoe and Bleecker; the other, of $150, March 15th, 1838, receipted to Yoe and Bleecker on account. Three other payments were made to A. R. Van Nest, who was then a part owner of the debt as a silent partner of the complainant, viz., one of $50, August 19th, 1837, and one of $25, September 14th, 1837, receipted as from Charles Yoe, assignee on account; the other, of $25, January 24th, 1838, receipted to Yoe and Bleecker. A. R. Van Nest knew that Yoe and Bleecker had made an assignment, although he never saw it, or heard of its terms. He never inquired about its terms, but one creditor who did inquire of Bleecker, obtained no information. He had heard that the assignee was selling the goods at private sale, and that R. A. Yoe was superintending it, and he repeatedly objected to the latter, when conversing with Bleecker, on account of his habits. He never had any communication with the assignee, or from him; and he was informed by Bleecker that the whole debt would be paid, and so understood till after the last receipt was given.

The allegation in the answer being limited to the complainant, is not proved; there is no evidence that he knew of the assignment, except his statement in the bill, that he had been informed of an assignment, in which all the creditors were to share alike. And the question in issue might here be dismissed. It was urged that the complainant and A. R. Van Nest, had means of knowledge, because the assignment was recorded in the Register's Office of the City of New-York. There was no real estate in this city affected by it, and recording it here was an unmeaning form. It was not notice, or the means of notice, to any person.

The payments to A. R. Van Nest, not being made as a dividend; and being accompanied with a declaration which made the assignment a matter of perfect indifference to him, and which was calculated to mislead him and prevent inquiry; could scarcely operate to estop him from questioning the validity of the assignment, if he should afterwards learn that it contained provisions which rendered it fraudulent. And in reference to the fraud in the case, as developed by the evidence, there is no pretence that A. R. Van Nest was aware of any of

the facts which establish it. His having heard that R. A. Yoe was *superintending* the assignee's sale of the goods at retail, was not notice to him that there had been no change of possession, or that R. A. Yoe was selling, collecting and buying, as he had done before the assignment; and he objected, on every occasion, to the propriety of R. A. Yoe's having even the superintendence of the assignee's sale.

I have examined the authorities cited by the defendant on this point, viz: *Hone* v. *Henriquez,* (13 Wend. 240.) *Allen* v. *Roosevelt,* (14 Wend. 102.) *Van Hook* v. *Whitlock,* (7 Paige, 378;) and *Clay* v. *Smith,* (3 Peters, 411.) But I am satisfied that there is nothing in this case, which brings it within the well settled principles of those decisions.

In *Adlum* v. *Yard,* (1 Rawles' R. 163, 177,) a case like those alluded to, it is said, that if a creditor receives a payment on account from an assignee, not having seen the assignment, or having been erroneously informed, he is not precluded from avoiding it on subsequently learning its true character.

Instead of holding the creditor bound by the receipt of a payment, under the circumstances proved here, this court, in the exercise of its ordinary jurisdiction, would set aside a release if he had been induced to execute one by a similar representation.

There must be a decree avoiding the assignment as to the complainant, and directing the amount due to him for debt, interest and costs, to be paid out of the assigned property which remained in the hands of the assignee at the commencement of the suit, or which he had appropriated upon the debts owing to him by the assignors.